*391 LESLIE H. SOUTHWICK, Circuit Judge,
dissenting:
The majority correctly notes that we apply a clear-error standard of review to a district judge’s fact-finding on sentencing enhancements. The standard “only requires a factual finding to be plausible in light of the record as a whole.” United States v. Rodriguez, 630 F.3d 377, 380 (5th Cir.2011). Still, “the government [must] prove[ ] any facts necessary to support the enhancement by a preponderance of the evidence.” Id.
The government was required to prove that Ewing had constructive possession of the two firearms found in a closet accessed from the living room. Respectfully, I disagree with the majority that such evidence exists. I dissent.
Whether we analyze constructive possession in a joint occupancy context or in the hidden compartment context as the majority does, “something else (e.g., some circumstantial indicium of possession) is required besides mere joint occupancy [in a residence with a firearm] before constructive possession is established.” United States v. Mergerson, 4 F.3d 337, 349 (5th Cir.1993). We have required “additional ‘circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge.’ ” United States v. Mudd, 685 F.3d 473, 477 (5th Cir.2012). The additional evidence must support “a plausible inference that the defendant had knowledge of, and access to, the item.” United States v. Houston, 364 F.3d 243, 248 (5th Cir.2004).
For the purposes of this appeal, I will assume this caselaw means that if there were evidence to support an inference that Ewing knew of the weapons and could have accessed them, that is enough. We are not requiring a reasonable inference that Ewing is the one who acquired the two weapons, or even that he ever touched them. Whose weapons they were, and whoever used or took possession of them, would not matter under that conception of the prohibition. Thus, the relatively undisputed facts are irrelevant that the residence was his parents; that it had previously been owned by Ewing’s great-grandmother; that Ewing resided there from 1995 to 2000, was imprisoned, then returned to live there from November 2010 until his arrest in February 2011; and that the weapons were acquired and placed in the closet by other family members during Ewing’s initial time in the house.
Perhaps Ewing himself acquired those two handguns and was the one who put them in the bag in the closet, or regardless of their origins, perhaps Ewing at some time took the two weapons from the closet to examine or use. We are not requiring any of those actions, for which there is no evidence. Residing with knowledge and access are all that we require.
As the basis for recommending six-level enhancements, the Presentence Report (“PSR”) stated: “Officers discovered in the living room closet two pistols,” and then described the weapons. In the section computing the offense level, in which the “Specific Offense Characteristics” were described, the PSR stated: “Three (3) firearms were discovered in the defendant’s possession.”
It is evident from the PSR that two of the weapons were in Ewing’s “possession” only if being found in a house in which he resided with other people was enough. Joint occupancy is not enough. Mergerson, 4 F.3d at 349. I do not interpret the majority to say that evidence that would be insufficient otherwise becomes sufficient merely by being stated in a PSR. Such an interpretation clashes with the principle that “[g]enerally, a PSR bears sufficient indicia of reliability to permit the *392 sentencing court to rely on it at sentencing.” United States v. Ollison, 555 F.3d 152, 164 (5th Cir.2009). Elaborating on what that means, we also have held that a “district court may adopt facts contained in a PSR without inquiry, so long as the facts have an adequate evidentiary basis and the defendant does not present rebuttal evidence.” United States v. Caldwell, 448 F.3d 287, 290 (5th Cir.2006). There is no adequate evidentiary basis, even if assigning all three weapons to Ewing should even be considered a “fact” in this PSR, other than their being found in a house with a joint occupancy. Joint occupancy is an insufficient fact. The government has the burden to prove a sentencing enhancement. Rodriguez, 630 F.3d at 380. It failed.
Perhaps, though, instead of being a fact-finding without an evidentiary basis, the PSR’s assignment of all three firearms to Ewing should be considered a legal conclusion. If so, there is not a mirror proposition in the precedents that a PSR’s legal conclusions as to the applicability of a sentencing enhancement are presumed reliable and must be rebutted by a defendant. A legal conclusion in a PSR, unsupported by factual findings with an evidentiary basis, does not shift this burden to a defendant.
The majority writes: “The only evidence presented to contest Ewing’s knowledge was the testimony of his family members.” I see the opposite problem. No evidence was introduced to show Ewing’s knowledge, which makes the strength of contesting evidence unimportant. Although the standard of proof for sentencing enhancement is only a preponderance of the evidence, it is the government that bears this burden. Id. The government might have sustained this burden through DNA or fingerprint evidence, but tests for that kind of evidence failed. So too the government might have sustained this burden by showing that the firearms were in plain view. See Mudd, 685 F.3d at 479. The police officer who discovered the firearms testified that the firearms were found in a living room closet “pretty well full of items,” and located in a camera bag that was itself “up underneath some stuff’ including “a bunch of clothes, bunch of DVDs in a bag” with “stuff stacked all around it” such that a person “would not have easy access to it.”
In 2011, when the two handguns were found, the closet was unlocked and Ewing could have accessed the weapons. Therefore, I agree Ewing had access. The issue that divides me from the majority is whether there is evidence Ewing knew of the handguns. The majority relies on circumstantial evidence that I find insubstantial. Among the items of circumstantial evidence were supposedly doubtful explanations about the weapons by some of Ewing’s family.
“Inconsistent statements and implausible explanations are among the behaviors previously recognized in this circuit as circumstantial evidence of guilty knowledge.” Mudd, 685 F.3d at 478. To connect Ewing to those weapons, the majority identifies inconsistencies in the testimony of three other occupants of the residence. Ewing’s father, mother, and grandmother testified at the guilt phase of his trial. These three witnesses agreed that a former resident of the house — Ewing’s great-grandfather— was the one who initially possessed these firearms. The witnesses all agreed that Ewing’s great-grandmother took the weapons from him and placed them in the living-room closet. One inconsistency noted by the majority is that the witnesses varied on what words they used to identify the initial owner’s familial relationship. Ewing’s father referred to the man as his “wife’s grandpa,” “the grandpa,” and the *393 grandmother’s “husband.” Ewing’s mother referred to him as her “grandfather,” before clarifying that he was her “step grandfather.” Ewing’s grandmother called him a live-in “friend.” All I perceive from these different labels is that the proper relationship label for someone several generations removed, when more than one marriage may have been involved, may not have been clear to some in the family.
A second inconsistency was that Ewing’s mother and grandmother said Ewing’s great-grandmother took each of the two guns from the great-grandfather on separate occasions, while the majority interprets Ewing’s father to have testified that both guns were taken at the same time. I do not interpret the father’s testimony that way. The father was asked to “describe to the jury how those guns ended up in the closet.” He replied:
My wife’s grandmother who we were living with, her — her husband, the grandpa — my wife’s grandpa used to go out and drink like every other weekend when he was off and they have these fields in our area that they used to go— they have couches and chairs and stuff where they all — all their friends meet together and they drink. They had trees and stuff where they couldn’t be seen and he would find them and bring them home. And my wife’s grandmother took them away from him because he be drunk and she placed them in there in this bag and put them in there to get them away from him.
The father was asked to clarify: “So you were there at the time and saw her do that?” He responded: “Yes.” He was asked whether Ewing was home “observing that.” He responded: “No, sir. He wasn’t.” On cross examination, Ewing’s father responded that he “happened to be present in the year 2000 when [his] -wife’s grandmother put them there” and that he “physically saw her do it.” The father was unclear as to whether one or two seizures occurred.
A third supposed problem was that Ewing’s father and mother testified that the great-grandmother took the guns from Ewing’s great-grandfather when he was drunk. Ewing’s grandmother testified alcohol was not a factor. This is the only direct inconsistency. It was certainly for the district court to determine what to make of that difference — a telling inconsistency or different perceptions or knowledge or willingness to acknowledge an uncomfortable detail.
Finally, there was not complete agreement about the year that the weapons were placed in the closet. Ewing’s father testified that the guns were placed in the closet “around 2000”; Ewing’s grandmother testified “around 2000” and in “2000.” Ewing’s mother first stated: “I can’t remember the exact dates.” Asked again whether she could remember the year, she testified: “It would have been like in '97, '96. It was in 2000 — I think it was in 2000. I’m not for sure.” To the extent there are clear differences in dates, and I am not sure there are, no one was seeking to protect Ewing by saying the weapons were taken at a time when he was incarcerated and not living in the home.
I see in these allegedly condemning inconsistencies nothing more than the usual minor differences in testimony about events. The general thrust of everyone’s story was the same, and the stories are plausible. True, the district court makes credibility determinations and draws reasonable inferences, but I do not find it reasonable to conclude that someone who testifies in 2012 about events in about 2000 must be precise about these minor matters in order to keep that testimony from being incriminating.
*394 Even if these possible discrepancies could reasonably be considered by a district judge as serious in some respects, the potential dissembling of witnesses other than the accused about actions of individuals other than the accused should not matter. When this court has recognized suspicious behaviors as evidence of guilty knowledge, we have usually done so when the defendant so behaves, typically at the scene and time of discovery of contraband. See, e.g., United States v. Mendoza, 522 F.3d 482, 489-90 (5th Cir.2008) (defendant’s statements to border patrol agents); United States v. Villarreal, 324 F.3d 319, 325 (5th Cir.2003) (defendant’s statements to police at the time of arrest and in a post-arrest interview); United States v. Cano-Guel, 167 F.3d 900, 905 (5th Cir.1999) (defendant’s statements to customs officials).
The criminal activity in which we often consider these behaviors is drug possession. After an officer finds drugs hidden in a defendant’s vehicle, these behaviors are relevant in determining whether the defendant knew of the drugs or rather was the unwitting conduit of a third party. See United States v. Resio-Trejo, 45 F.3d 907, 911 (5th Cir.1995). The majority arguably extends this line of cases by holding that the guilty knowledge of a defendant can be evidenced solely by third-party statements, made during trial testimony, that are at the very least internally consistent.
To the extent that the holding rests on implausibility, this court further permits witnesses’ lack of credibility on one subject — why and when firearms were stored by someone else — to be evidence the defendant knew the guns were in the closet. I recognize the logical inference here, namely, that these family members concocted tales to protect Ewing, but their stories did not quite hold together. The contradictions, though, were on such minor points, and nothing was implausible, that I find no support for any relevant inference.
Any possible inconsistencies in the testimony of other witnesses have no bearing on knowledge Ewing would have had about the guns. The testimony given by Ewing’s father, mother, and grandmother is consistent that the guns came from Ewing’s great-grandfather (though the relationship label varied), and were placed in the closet by Ewing’s great-grandmother in 2000 without Ewing’s contemporary or later knowledge. The family members arguably became more implausible when they testified that even though one or more of them disapproved of firearms, these two weapons remained in the closet for years.
There is one statement made by Ewing that the majority discusses. At the sentencing hearing, he said that “had I known the guns was in the house I would have got rid of them.” The majority views this as not credible because Ewing’s DNA was found on the firearm in the bedroom, possession of which Ewing does not challenge on appeal. He clearly did not get rid of that one. Ewing made this statement after the district court had determined that he was responsible for all the firearms. Therefore, the district court could not have relied on this statement to support the attribution of the two contested firearms. Further, the statement followed an exchange among both attorneys and the court about the two disputed firearms, not the one found in a bin beside Ewing’s bed. Ewing’s statement that he would have gotten rid of any firearms he knew about is implausible in light of the weapon he kept in his bedroom. Ewing did protest too much, but I see this implausibility as having little to do with whether he actually knew about the two firearms in the living-room closet.
Not only did the district court not consider this one statement by Ewing before *395 making the sentencing decision, the court did not refer to the credibility of Ewing’s family members or the inconsistency or implausibility of their statements. The district court simply ruled that the PSR “properly attributed” the firearms to Ewing. The views of inconsistency and implausibility originate with this court’s assessment of what is “plausible in light of the record as a whole.” United States v. Cisneros-Gutierrez, 517 F.3d 751, 764 (5th Cir.2008). Although it may be logical to speculate that the family members concocted tales to hide Ewing’s knowledge, I find no support for deriving this inference given that the contradictions were on such minor points and the stories were plausible.
The question, again, is whether these statements amount to evidence demonstrating that Ewing had guilty knowledge of the firearms. Mudd, 685 F.3d at 477. We have held that certain circumstantial evidence did not permit the “reasonable inference of guilty knowledge” when the “evidence invited only speculation and conjecture.” United States v. Beckner, 134 F.3d 714, 719 (5th Cir.1998). We have found plain error in applying a sentencing enhancement when the government speculated, but did not provide evidence, that the defendant’s false statements caused a bank to issue a loan. United States v. Sandlin, 589 F.3d 749, 757 (5th Cir.2009).
The testimony of Ewing’s family members was consistent that Ewing did not observe the two firearms being hidden and Ewing did not subsequently learn of the firearms’ existence. As my review of the majority’s reasoning has attempted to show, there is no evidence to create a plausible or reasonable inference — as opposed to speculation or conjecture — that Ewing had guilty knowledge of the existence of the two firearms. There must be “some evidence supporting at least a plausible inference that the defendant had knowledge.” Mudd, 685 F.3d at 477. In the absence of this evidence, I would hold that the two sentencing enhancements based on the two firearms in the living-room closet are unsupported by any evidence. Therefore, I would vacate and remand to the district court for re-sentencing.